UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
A.U. and A.P.., individually and on behalf of               :
M.U.,                                                       :
                                    Plaintiffs,   :              15 Civ. 6777 (LGS)
                                                            :
            -against-                             :              OPINION AND ORDER
                                                            :
NEW YORK CITY DEPARTMENT OF                     :
EDUCATION,                                                  :
                                    Defendant.   :
------------------------------------------------------------X

LORNA G. SCHOFIELD, District Judge:

  Plaintiffs A.U. and A.P., individually and on behalf of M.U., bring this action against the New York City Department of Education ("DOE") pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.  Plaintiffs seek review of the April 29, 2015, decision of the New York State Review Officer ("SRO Decision") reversing the January 20, 2015, decision of the Impartial Hearing Officer ("IHO Decision"), which found that the DOE had failed to provide a free and appropriate education ("FAPE") to M.U. during the 2013-2014 school year.  The parties have cross-moved for summary judgment.  For the reasons below, Defendants' motion is denied and Plaintiff's motion is granted.

### I. STATUTORY FRAMEWORK

  The IDEA mandates that states receiving federal special education funding provide disabled children with a FAPE.  20 U.S.C. § 1412(a)(1)(A); *L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 102 (2d Cir. 2016); *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013).  "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ('IEP') for each such child."  *R.E. v. N.Y.C. Dep't of Educ.*,

694 F.3d 167, 175 (2d Cir. 2012).  An IEP is a written statement that "'describes the specially designed instruction and services that will enable the child to meet' stated educational objectives and is reasonably calculated to give educational benefits to the child." *M.W.*, 725 F.3d at 135 (quoting *R.E.*, 694 F.3d at 175); *see also* 20 U.S.C. § 1414(d).

New York delegates the annual development of an IEP to a local Committee on Special Education ("CSE").  *See* N.Y. Educ. Law § 4402(1)(b)(1), (1)(d).  At a minimum, a CSE must be composed of the student's parent(s) or their equivalent; one of the student's special education teachers or providers; one of the student's regular education teachers if the student participates in a regular education program; a school psychologist; a qualified school district representative; an individual who can interpret the instructional implications of evaluation results; a school physician; and a parent of another student with a disability.  *See* N.Y. Educ. Law § 4402(1)(b)(1)(a).  "The CSE must examine the student's level of achievement and specific needs and determine an appropriate educational program."  *R.E.*, 694 F.3d at 175 (citing *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 107-08 (2d Cir. 2007)).

If a parent believes that the DOE has failed to provide a FAPE to his or her child, the parent may "unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement."  *M.W.*, 725 F.3d at 135 (citing *Florence Cty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 9-10, 16 (1993)).  To seek reimbursement, the parent must file a due process complaint, which triggers administrative proceedings beginning with a hearing before an Impartial Hearing Officer ("IHO").  *See id.* (citing 20 U.S.C. §§ 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)).  The IHO hearing is governed by the three-part *Burlington/Carter* test, as construed by New York Education Law § 4404(l)(c): "(1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to

reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." *See id.*

An IHO's decision may be appealed to a State Review Officer ("SRO"). *See* N.Y. Educ. Law § 4404(1)(c); *L.O.*, 822 F.3d at 103. The SRO "shall review and may modify . . . any determination of the impartial hearing officer . . . ." N.Y. Educ. Law § 4404(2). An SRO's decision is the final administrative decision, but an aggrieved party may seek review of the decision by commencing an action in federal district court. 20 U.S.C. § 1415(i)(1), (i)(2)(A); *L.O.*, 822 F.3d at 103.

## II.   BACKGROUND

Plaintiffs A.U. and A.P. (the "Mother") (collectively "Parents") are the parents of M.U., a currently 17-year-old student who has been classified by the CSE as a student with autism. Defendant DOE is responsible for providing a FAPE to children with disabilities, aged from 3 to 21 years, who reside in New York City.

### A.   M.U.'s Needs and Education Before the 2013-2014 School Year

The Mother testified as to M.U.'s needs as follows: historically, M.U. exhibited extreme sensitivity to noise and overwhelming environments, precluding his ability to participate in a school-based educational setting. During preschool, M.U. received services both in the home setting and school setting. Within the school setting, he "started just completely withdrawing into himself. He would sit in a corner and cover his ears. The environment was too over-stimulating for him." Therefore, from the ages of six to thirteen, M.U. was educated primarily in the home setting. At that time, M.U. required 1:1 instruction to make progress and attain small foundational skills, such as maintaining eye contact for a few seconds.

At approximately ten years of age, M.U. was reintroduced to a school setting part-time in a program for students with autism (McCarton); however, it proved too overwhelming, and M.U. attended class with other students for only 30 minutes weekly. Otherwise, he was in a separate room with a 1:1 teacher. During this time, M.U.'s 1:1 home instruction continued. The Mother testified that during these school years, the DOE agreed that M.U. was appropriately receiving home based 1:1 instructional services. However, the DOE informed the Mother that it was limited to recommending only 6:1:1 programs for M.U. Over the years, M.U.'s Parents had several opportunities to view various 6:1:1 classes. The Mother testified that the students she observed in the 6:1:1 classes over the school years were nonverbal and exhibited similar behaviors (sudden movements, noises and tantrums) as the students at McCarton, where M.U. was overwhelmed and had difficulty learning.

The Mother testified that it took hard work to bring M.U. out of himself to connect and learn, and placing M.U. in a 6:1:1 environment similar to the ones she had viewed, or a program like McCarton, would cause "him to go back inside of himself and close out the noise and the stimulation." Historically, M.U. has exhibited the least amount of language progress when he did not have appropriate peer models. It became evident that M.U.'s use of language is contingent on having appropriate communicative partners.

The CSE did not convene an IEP meeting or offer a placement for M.U. for the 2012-2013 school year. Therefore, his Parents placed him at the Cooke Center Grammar School ("Cooke") for the 2012-2013 school year. During that school year, M.U. was placed in a classroom with six other students, two teachers (one head teacher and one assistant teacher), and three paraprofessionals, one of whom was assigned specifically to M.U.

### B. Materials the CSE's Obtained Before the Meeting to Create an IEP

Prior to the May 2013 meeting to create an IEP for M.U. for the 2013-2014 school year, the DOE did not conduct a psychoeducational evaluation.  Instead, the DOE relied on a private neuropsychological evaluation conducted in 2012 that was provided by the Mother.  The neuropsychologist who conducted the evaluation, Dr. Kenner, noted in her report that at the time of the evaluation, M.U. was being home-schooled (in a 1:1 ratio).  Dr. Kenner recommended that M.U. remain in a setting with a high teacher to student ratio.  Dr. Kenner further recommended that M.U. attend a small class, receive individual special education teacher support in the classroom "to facilitate on-task behavior and social interaction", and that M.U. should participate in a "small, facilitated [social skills] group with good role models."  Dr. Kenner further recommended that M.U. required a curriculum focused on academics and social skills.  Dr. Kenner also concluded that because M.U. has a strong willingness to learn and is interested in relationships with his peers, M.U. would continue to make progress in his development (with appropriate interventions).  DOE school psychologist and district representative Rose Fochetta testified that she agreed with Dr. Kenner's findings and that she did not recall to what extent the neuropsychological evaluation was discussed at the IEP meeting.

Prior to the meeting, Ms. Fochetta observed M.U. for 40 minutes in his science class, which was not his regular classroom environment.  The observation was conducted in December of 2012, within the first few months of M.U.'s first attendance in a classroom setting.  M.U.'s paraprofessional was absent the day of Ms. Fochetta's observation; therefore, an assistant teacher in the science class took the role of M.U.'s 1:1 paraprofessional.  Ms. Fochetta testified that her observation differed from M.U.'s typical environment, in that the observation was not conducted in M.U.'s regular classroom, with his regular teacher and paraprofessional.  According to Ms.

Fochetta, in this environment with six students, two teachers, and one paraprofessional, M.U. was "easily internally distracted which lead [sic] to difficulty following the directions and expectations of the classroom." Ms. Fochetta did not recall whether the classroom observation was discussed in any detail at the IEP meeting.

Before the CSE meeting, the CSE contracted to have private evaluators conduct a speech/language evaluation and occupational therapy evaluation of M.U., both in January 2013. The CSE also obtained M.U.'s most recent progress report (at that time) from Cooke dated March 2013, a GMADE Assessment from October 2012 (conducted by Cooke), and an Adaptive Behavioral Assessment System Interpretive Report dated December 2012 (also completed by the staff at Cooke).

### C. The CSE Meeting to Create an IEP for the 2013-2014 School Year

The CSE team at the May 7, 2013 CSE meeting consisted of the Mother, parent member Sandra Morabito, Cooke supervisor Cheryl Tuttle, Cooke head teacher Jessica Liebov, the DOE special education teacher Feng Ye, and the DOE school psychologist and district representative Rose Fochetta. The evaluative materials the IEP team reviewed and relied upon to develop M.U.'s 2013-2014 IEP included the Neuropsychological Evaluation conducted on February 29 and March 1, 2012, Ms. Fochetta's classroom observation conducted on December 12, 2012, a speech/language evaluation conducted on January 9, 2013, an occupational therapy evaluation conducted on January 7, 2013, the March 2013 Cooke progress report, the October 2012 GMADE assessment, and an Adaptive Behavior Assessment System Interpretive Report dated December 18, 2012.

The CSE team, including the Mother, reviewed those documents to develop M.U.'s IEP. Specifically, the neuropsychological evaluation, which reflected significant cognitive and

6

academic deficits, was used to develop the IEP's "present levels" section. The speech-language evaluation was discussed at the meeting. The team considered the occupational therapy evaluation and decided that occupational therapy services continued to be warranted. The Cooke Center progress report was considered and used to develop the goals from the various therapists' input in the report. The team reviewed the GMADE report, an internal Cooke assessment, which was consistent with the results of the neuropsychological evaluation.

The resulting IEP classified M.U. as a student with autism, and recommended, inter alia, a 6:1:1 special class in a specialized school for a 12-month school year, a full-time crisis-management paraprofessional, and the related services of individual speech therapy three times per week, group speech therapy twice per week, individual occupational therapy once per week, group occupational therapy twice per week, individual counseling twice per week, and group counseling once per week.

M.U.'s sensory needs were specifically addressed by a goal and related short-term objectives, as well as by the behavior intervention plan ("BIP"). The IEP specified that M.U. required "small group instruction" and "individual support to focus his attention." Ms. Fochetta testified that a special 6:1:1 class was recommended based on M.U.'s need for a small classroom that was not overstimulating. The CSE team further recommended a 1:1 paraprofessional to address M.U.'s need for ongoing, constant prompting and redirection.

Ms. Fochetta also testified that the 6:1:1 class was not adequate to address M.U.'s needs, and therefore, a 1:1 crisis management paraprofessional was offered to M.U. The Mother testified that the IEP team agreed that a 1:1 crisis management paraprofessional was not appropriate for M.U., since M.U. did not exhibit behaviors that would require crisis management. However, according to the Mother, the CSE team was forced to choose from a

drop down menu, and chose a crisis management paraprofessional over the only other option of a health paraprofessional.  Ms. Fochetta testified that she was not familiar with the qualifications or backgrounds of paraprofessionals that work within the DOE.

The CSE team also discussed that M.U. does not require a BIP.  The Mother testified that the BIP "created a picture of M.U. that was really inaccurate because he doesn't have those kind of behaviors that require a crisis para. So here we were trying to make something fit that didn't really fit and it created this picture of a kid who needs a crisis para."  The DOE created a functional behavior assessment and BIP.  The Mother testified that at the meeting when the crisis management paraprofessional was chosen from the drop down menu, the DOE was required to complete a BIP.  Ms. Fochetta testified as to M.U.'s behaviors that might require intervention, including his distractibility and need for sensory support, his somewhat inappropriate punching, and his safety awareness: "he really had difficulty focusing his attention on tasks, and he really needed a lot of one to one prompting and support just to focus. There were also concerns about the need for sensory support, sensory breaks, that type of thing, and that individual support may be needed for that.  At the time he was also I mentioned punching individuals somewhat inappropriately.  Again, it was to get their attention and it wasn't in an aggressive way.  And his mom also expressed concern about his safety awareness, you know, his ability to recognize when he is in a dangerous situation, and that was an area of concern."  Ms. Fochetta testified that "[t]here was some self-stimulatory behavioral concerns" with M.U.  The District agreed, and the IEP acknowledges, that in his educational setting at Cooke, M.U. did not engage in behaviors and that he did not require a BIP.

The CSE team also discussed M.U.'s need for a program that focused on academics, and did not provide for vocational skills.  In fact, despite the fact that M.U. would be turning 15

during the 2013-2014 school year, the Mother and the DOE agreed that a transition plan would not be appropriate or necessary for M.U.  Therefore, one was not included on the IEP.  The IEP contained a section on Measurable Postsecondary Goals -- Long-Term Goals for Living, Working and Learning as an Adult that addressed the issue of M.U.'s future transition to living as an adult after having finished school.  The Mother requested that the CSE team "wait to discuss transitional supports" in light of (a) the Parents' plan to keep M.U. in school until he is 21 years old, (b) of M.U.'s present levels of performance, and (c) of the fact that his transition needs are focused on his courses of study.  Ms. Liebov testified that the CSE agreed that M.U. required an academic- based program.

The IEP included strategies such as (1) technology as a means of positive reinforcement; (2) visual supports; (3) verbal prompts; (4) redirection; (5) repetition; (6) manipulatives; (7) breaking tasks and directions into small increments; (8) scaffolding; (9) graphic organizers; (10) sentence starters; (11) modeling; (12) small group instruction and (13) individual support to focus M.U.'s attention.

The Mother informed the DOE that she was concerned that M.U. needed to be placed with role models.  Ms. Fochetta agreed with this concern.  Ms. Fochetta agreed with Dr. Kenner that M.U. needed to develop his social skills in a facilitated group with good role models.  The IEP team incorporated M.U.'s need for verbal peer models into the IEP.  The IEP indicates that M.U. "needs appropriate peer modeling.  He needs to be in a program with a focus on academic instruction …He would have difficulty in a setting where there is a lot of bells ringing and a lot of noise."  The Mother's concerns are reflected in the IEP's "Parent Concerns" section which noted the Mother's concern that M.U. "need[ed] appropriate peer modeling" and that he needed "higher functioning role models."  Ms. Fochetta testified that she had no reason to disagree with

9

the Mother's expressed concerns about her child having role models, and called such concerns "perfectly reasonable." Ms. Liebov testified at the meeting that M.U. had just started attending a class environment in September 2012, and he was showing progress because of the peer models in his class, as well as the support of two teachers and three paraprofessionals assisting in the classroom.

At the meeting, the Mother expressed concerns regarding the appropriateness of a 6:1:1 program recommendation, in that there would only be one teacher in the classroom for all six students, the program would not be supportive enough academically, and that M.U. needed more intensive academic instruction, particularly considering the high level of needs of the students in 6:1:1 placements. Ms. Liebov further testified at the IEP meeting, and the CSE agreed, that Cooke was a good placement for M.U. because of the support in the classroom, the academic rigor, as well as the presence of two teachers in the classroom.

The Mother testified that she expressed to the CSE her concerns that M.U. requires a wider range of social opportunities than the 6:1:1 would provide. Based on the Mother's observations of 6:1:1 programs, she had observed students who were not interested or capable of being social. The Mother also testified that she was concerned about the lack of opportunity for socialization, since the students in 6:1:1 classes she observed were mostly contained in their classroom and did not interact with the other students in the school. According to the Mother, M.U. is more socially motivated than other students with autism who function at a similar level. At the IEP meeting, both the DOE and M.U.'s Mother agreed that M.U. requires placement in a class with verbal peers.

Ms. Fochetta testified that not all 6:1:1 placements are the same. According to the Mother's testimony, Ms. Fochetta stated that some classes have non-verbal students, and that

10

there is a wide range of verbal abilities and behavioral needs in the 6:1:1 programs. Ms. Fochetta admitted that she is unaware of what placement students will go to or who they will be grouped with. Ms. Fochetta recommended that the Mother view the specific 6:1:1 class that was recommended before making a decision to place M.U. there. According to the Mother's testimony, Ms. Fochetta indicated that she understood the Mother's concerns and appeared to agree with M.U.'s need for more verbal role models, but stated that it was the best the CSE could do, and the Mother should "see what happens."

### D.  The First Offer of Placement

The Mother received an offer of placement for a 6:1:1 at 04M117 at the end of May 2013. The Mother was unable to reach a representative of the school, so the Mother showed up at the school to visit. The school's assistant principal expressed concern regarding the appropriateness of the school for M.U. In a letter dated June 13, 2013, the Mother indicated her concerns with the placement, requested that the DOE inform her which class M.U. would be placed in, and further indicated concerns regarding the IEP. She also requested that the DOE send her more information about the proposed class. On June 17, 2013, the Parents wrote a letter to the CSE reiterating the concerns with the IEP and placement offer. In that letter, the Parents noted that they had not received a response to the June 13 letter, and therefore, the parents were reenrolling M.U. at Cooke. The Parents further requested that the DOE contact them if any of their concerns regarding the IEP and placement were inaccurate. On June 24, the CSE sent the Parents a letter acknowledging receipt of the Parents' concerns, and requesting that the Mother send more information for the CSE to consider. Thereafter, on July 2, the Parents sent the CSE M.U.'s most recent Cooke progress report.

### E. The Second Offer of Placement

The CSE sent the Parents a new offer of placement for a 6:1:1 class at P138M@47 ("P138") dated June 20, 2013; however, the offer of placement was not postmarked until June 25, 2013. The placement letter noted that the Parents "have a right to visit this site." The projected IEP implementation date was July 1, 2013. The Mother contacted the school to arrange a visit, and the school provided an appointment date of July 11, 2013.

The Mother, along with Rachel Munoz, a teacher at Cooke, visited P138. Victoria Walden, who worked as a unit teacher at P138, provided an hour-long tour. Ms. Walden testified that she brought the Mother to the computer room, the two 6:1:1 high school age classes, and the P138 related service therapy room. Ms. Walden testified that the Mother asked how P138 determines which students are placed in which classroom for grouping purposes, and that in response Ms. Walden directed the Mother to the administrative principal. Ms. Walden testified that students at P138 work on adaptive daily living skills every day.

Regarding the two 6:1:1 high school classes, the Mother learned that there were only two classes available to M.U., and both were already in session. The Mother observed that the students in both classes were non-verbal, minimally verbal with heavy prompting, or used assistive technology devices to communicate. Ms. Walden told the Mother that "there was a mix of students, verbal and non-verbal." The Mother observed that there was no interaction among the students, even though they were eating snack rather than engaging in an academic session.

During the visit, the students in the two classrooms were engaged in disruptive behavior such as making loud, sudden noises and slapping. Ms. Walden testified that at P138 "Social skills happen. There are opportunities for students to increase their social skills on a daily basis within the class room, outside of the class room, student to student, adult to student, staff in the

school community.  ASL staff and students interact with our students just in the hallways so there's ample opportunity throughout the day on a routinely [sic] basis, be it in the cafeteria also when they're making choice -- choice making decisions with the cafeteria staff.  So there are social skills opportunities in the school throughout the day."

The Mother observed the students working on skills that M.U. had mastered several years ago.  Classwork involved cutting and pasting pictures (which some students were unable to do because of fine motor limitations), pencil markings rather than letters and words.  Student names were written by class staff.  Students received tokens in exchange for edible reinforcers for appropriate behavior, a lower level skill than M.U. was capable of.  Students were being introduced to the concept of money, which M.U. already knew.

During her visit, the Mother learned that a large percentage of the day at P138 was devoted to eating (nearly two and a half hours).  The classroom schedules indicate that one of the proffered classrooms does not teach math to its students, spends only three periods weekly on literacy, and has no academic instruction at all on Fridays.  The other class has a similar schedule, where Fridays contained less than one period of literacy.  The Mother was informed that the students at P138 had time set aside during their day for jobs such as cleaning and filing.

### F.  M.U.'s Experience at Cooke

During the 2012-2013 school year at Cooke, M.U. received math instruction in a whole group with a teacher, assistant teacher, and two paraprofessionals, and in small group of up to three students with one teacher and his paraprofessional.  In social studies, M.U. received 1:1 support for learning.  M.U.'s English Language Arts class provided him with instruction in a small reading group of three students with one teacher.  M.U. also received 1:1 teacher instruction for reading.  For writing, M.U. received 1:1 support.  At the time of the May 2013

IEP meeting, restating and explaining information was the primary focus of M.U.'s 1:1 paraprofessional.

For the 2013-2014 school year at Cooke, it was determined that, with appropriate teacher support in a small group of two or three students, M.U. did not require the 1:1 services going forward, as he was able to be more independent.  For the 2013-2014 school year at Cooke, M.U. was placed in a class with six other students, two teachers, and three paraprofessionals.  M.U. received group instruction in reading, writing, Word Study and mathematics.  M.U. received additional 1:1 instruction with a teacher in reading, writing and Word Study.

### G. Prior Proceedings

On February 3, 2014, the Parents filed a Due Process complaint alleging that the DOE denied M.U. a FAPE for the 2013-2014 school year.  Over the course of three hearing dates, the DOE presented two witnesses, and the Parents presented five witnesses.  The IHO found that the DOE had failed to offer M.U. a FAPE, that Cooke was an appropriate placement for M.U., and that equitable considerations favored the Parents. The IHO ordered the DOE to reimburse the Parents for M.U.'s placement at Cooke during 2013-2014, as well as for transportation to Cooke.

On February 20, 2015, The DOE appealed the IHO's decision to the SRO.  Parents filed a Verified Answer on March 26, 2015.  The SRO overturned the IHO's decision, finding that the DOE offered M.U. a FAPE for the 2013-2014 school year.

### III.   STANDARD

A motion for summary judgment in the IDEA context is "in substance an appeal from an administrative determination, not a summary judgment [motion]." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012); *accord M.W.*, 725 F.3d at 138 ("Summary judgment in the IDEA context . . . is only a pragmatic procedural mechanism for reviewing administrative

decisions." (internal quotation marks omitted) (quoting *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam)).

In reviewing an SRO's decision, a district court determines whether the SRO's decision is supported by "the preponderance of the evidence, taking into account not only the record from the administrative proceedings, but also any further evidence presented before the District Court by the parties." *See Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 380 (2d Cir. 2003) (internal quotation marks omitted). "When an IHO and SRO reach conflicting conclusions, [a court generally] defer[s] to . . . the SRO's decision." *R.E.*, 694 F.3d at 189 (internal quotation marks omitted). However, the "factual findings must be 'reasoned and supported by the record' to warrant deference," *M.H.*, 685 F.3d at 241 (quoting *Gagliardo*, 489 F.3d at 114), and, if an SRO's decision is not reasoned and supported by the record, "a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189; s*ee also Reyes ex rel. R.P. v. N.Y.C. Dep*'*t of Educ.*, 760 F.3d 211, 218-19 (2d Cir. 2014). If an SRO decision does not reach a particular issue, but an IHO opinion does address that issue and is well reasoned and based on the record, the IHO opinion should be accorded deference. *See M.H.*, 685 F.3d at 252, 254 (affirming on appeal the district court's decision to defer to the IHO's conclusion that the school was an appropriate unilateral placement for the first plaintiff, and that the equitable considerations favored the first plaintiff, when the SRO did not reach those questions).

A district court "must give due weight to [the administrative] proceedings, mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *T.P.*, 554 F.3d at 252 (alterations in original) (internal quotation marks omitted). Accordingly, a federal court may not "substitute [its] own notions of sound educational policy for those of the school authorities." *M.W.*, 725

15

F.3d at 139 (internal quotation marks omitted).  However, conclusions of law are not accorded this deference and are reviewed de novo.  *See Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1122 (2d Cir. 1997) ("Consequently, the 'due weight' we ordinarily must give to the state administrative proceedings is not implicated with respect to that conclusion, because it concerns an issue of law; namely, the proper interpretation of the federal statute and its requirements.").

In deciding how much deference to accord the IHO and SRO, a reviewing court may take into account "whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *R.E.*, 694 F.3d at 189 (internal quotation marks omitted).  "The deference owed depends on both the quality of the opinion and the court's institutional competence."  *C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014).

## IV. DISCUSSION

Plaintiffs are entitled to reimbursement of tuition they paid for the 2013-2014 academic year because, applying the *Burlington/Carter* test, the preponderance of the evidence (i) does not support the SRO's decision that the district provided a FAPE; and does support the IHO's findings that (ii) Plaintiff's placement of M.U. at Cooke was appropriate and (iii) the equities favor them.

### A. Plaintiff's Challenge to P138 Was Not Improperly Speculative as a Matter of Law

The SRO concluded that Plaintiff's objection to the DOE's recommended placement, P138, was too speculative as a matter of law because M.U. never attended P138 and her objection as to how M.U.'s IEP would have been implemented was hypothetical.  This holding is contrary to recent Second Circuit law and is reversed.

*M.O. v. New York City Department of Education*, 793 F.3d 236 (2d Cir. 2015), which was decided three months after the SRO's decision, clarified prior law as stated in *R.E. v. New York City Department of Education*, 694 F.3d 167 (2d Cir. 2012). The SRO had cited *R.E.* for the proposition that the sufficiency of the DOE's offered program must be determined on the basis of the IEP alone, and not a retrospective and hypothetical assessment of how that plan might have been executed if the student had attended the public school. The Second Circuit explained that *R.E.* "stands for the unremarkable proposition that challenges to a school district's proposed placement school must be evaluated prospectively (i.e., at 'the time of the parents' placement decision') and cannot be based on mere speculation." *M.O.*, 793 F.3d at 244. "While it is speculative to conclude that a school with the capacity to implement a given student's IEP will simply fail to adhere to that plan's mandates, it is not speculative to find that an IEP cannot be implemented at a proposed school that lacks the services required by the IEP." *Id.* (internal citation omitted). Contrary to the SRO's conclusion, "*R.E.* does not foreclose all prospective challenges to a proposed placement school's capacity to implement a child's IEP." *Id.* "To conclude otherwise would require parents to send their child to a facially deficient placement school prior to challenging that school's capacity to implement their child's IEP, which is antithetical to the IDEA's reimbursement process." *Id.* at 244-45 (internal alteration and quotation marks omitted).

The SRO Decision foreclosed Plaintiff's challenge to the recommended placement at P138 solely because M.U. had not attended P138. The SRO did not address, as it should have, the factual question of whether P138 had the capacity to implement M.U.'s IEP.

### B. The Better Reasoned IHO Decision Is Accorded Deference Where the SRO Decision Was Silent

Plaintiffs' motion for summary judgment is granted because P138 could not offer M.U. a

FAPE; Cooke was an appropriate placement; and the equitable considerations weigh in favor of Plaintiffs.  Unlike the SRO, the IHO reached these questions.  The IHO Decision was well reasoned and supported by the record, and is therefore adopted as discussed below.

### *1. P138 Could Not Provide M.U. with a FAPE*

Plaintiffs dispute that the IEP recommendation of a 6:1:1 special class placement with a 1:1 "crisis" paraprofessional was appropriately designed to address M.U.'s special education needs, arguing that M.U. required a greater staffing ratio.  The recommended placement at P138 could not provide a greater staffing ratio, as the 6:1 class setting was the smallest class size per teacher on offer.  Even assuming that the IEP recommendation was appropriate, the recommended placement at P138 could not provide M.U. with a FAPE.

As discussed, the SRO Decision did not reach the factual issue of whether P138 could provide a FAPE, because of an error of law.  The IHO did reach this factual issue in a decision that is well reasoned and supported by the record.  The IHO observed that the two 6:1:1 classrooms that the Mother visited at P138 were the only ones for M.U.'s age group; that the students were largely non-verbal and did not interact; that in contrast, M.U.'s verbal skills were more highly developed, as he was speaking independently in short phrases, and with visual cues in longer sentences; and that M.U. needed verbal peers in order to model the language of other students in order to continue to progress.  The IHO found that the DOE failed to prove that P138 could offer a functional grouping for M.U. because peers lacked the verbal skills necessary to inspire M.U.'s social and communication progress; that P138 was not appropriate for M.U. because of the lack of verbal peers; and that P138's "mismatched, nonfunctional grouping" was inappropriate for M.U.  The IHO Decision was grounded in the (often undisputed) record of M.U.'s needs, as well as evidence of the actual environment in the two 6:1:1 classrooms at P138.

For these reasons, deference is accorded the IHO Decision. The DOE failed to offer a FAPE to M.U. for the 2013-2014 school year.

### 2. Cooke Was an Appropriate Placement for M.U.

The second prong of the *Burlington/Carter* test requires a plaintiff to show that her unilateral placement was "reasonably calculated to enable the child to receive educational benefits, such that the placement is likely to produce progress, not regression." *See T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 877 (2d Cir. 2016) (internal quotation marks and citations omitted). The IHO legitimately concluded, in light of the preponderance of the evidence, that the placement at Cooke was reasonably calculated to benefit M.U. and would meet the standard for a private placement: that it is likely to produce progress, not regression. "[T]he test for the parents' private placement is that it is appropriate, and not that it is perfect." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 837 (2d Cir. 2014) (internal quotation marks and citations omitted).

DOE does not challenge the adequacy of Cooke as a placement for M.U. According to the record, Cooke provides M.U. with instruction and attention in a small, three-student setting with extensive support to enable M.U. to focus and develop. The IHO observed that the record documents how M.U. benefited academically and socially from the careful selection of his peers for his reading, writing and math classroom at Cooke. Deferring to the IHO's factual conclusions, Plaintiffs have shown that Cooke's program was reasonably calculated to enable M.U. to receive educational benefits.

### 3. The Balance of the Equities Favors Reimbursement

Defendants do not contest Prong 3, that the balance of equities favors reimbursement, and the SRO did not address it. The IHO's decision that the balance of equities favored

reimbursement was reasoned and supported by the record, which showed that tuition costs at Cooke exceeded Plaintiff's household income.  The IHO Decision is therefore accorded deference on this issue as well.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is GRANTED, and Defendants' cross-motion for summary judgment is DENIED.  The Clerk is directed to close the motions at Docket Nos. 18 and 26 and to close the case.

Dated: August 25, 2016
       New York, New York

_____
**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**